**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| **TAMARA ST. MARY**, individually and on behalf of all others similarly situated, | **Case No:** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| **ELECTROSTIM MEDICAL SERVICES, INC.,** | JURY TRIAL DEMAND |
| Defendant. | |

## SUMMARY OF THE CLASS ACTION

Plaintiff Tamara St. Mary ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her undersigned attorneys, brings this class action against Electrostim Medical Services, Inc. ("Defendant") and complains and alleges upon personal knowledge as to herself and upon information and belief as to all other matters.

## INTRODUCTION

1.      Plaintiff brings this class action against Defendant for its failure to secure and safeguard the personally identifiable information ("PII") and personal health information ("PHI") (collectively "Personal Information") of approximately 543,000 individuals.[1]

2.      Defendant Electrostim Medical Services, Inc., is a privately held company located in Tampa, Florida. Defendant is "a medical device company specializing in home electrical stimulating devices, bracing, and accessories for pain management and physical rehabilitation."[2]

---

[1] https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed January 11, 2024).
[2] https://www.wecontrolpain.com/about (last accessed January 11, 2024).

3.      Defendant offers "a range of products, from wearable, flexible garments, to electrotherapy devices for pain relief" and "served over 70,000 patients and employs another 400 from the Tampa Bay area."[3]

4.      On May 13, 2023, Defendant detected suspicious activity within its computer network. In response, Defendant commenced an investigation, ultimately confirming that an unauthorized party accessed confidential information stored on Defendant's network between April 27, 2023, and May 13, 2023.

5.      On December 28, 2023, Defendant filed a notice with the U.S. Department of Health and Human Services Office for Civil Rights describing a data breach affecting approximately 543,000 individuals nationwide (the "Data Breach").[4] Additionally, Defendant posted a website notice describing the data breach (the "Notice").[5]

6.      In its Notice, Defendant admitted that the impacted files contained sensitive Personal Information, including "an individual's name, address, email address, phone number(s), diagnosis, insurance information and subscriber number, product(s) prescribed and billed."[6]

7.      Defendant provided limited details about the Data Breach, failing to mention whether the cybercriminal(s) responsible for breach were identified or whether the information exfiltrated was held for ransom. Defendant also failed to disclose whether its investigation detected the compromised information on the dark web. Instead, Defendant's Notice places the onus on those affected, encouraging "individuals to remain vigilant against incidents of identity theft and

---

[3] https://www.idstrong.com/sentinel/healthcare-cyber-attack-half-a-million-records-stollen/ (last accessed January 11, 2024).
[4] https://www.wecontrolpain.com/assets/docs/notices/data-security-event-notice.pdf (last accessed January 11, 2024); *See* Plaintiff's Notice of Data Breach (Exhibit #1).
[5] *Id.*
[6] *Id.*

fraud by reviewing your account statements and explanation of benefits and monitoring your free credit reports for suspicious activity."[7]

8.      Defendant did not offer credit monitoring rather than that offered by law, wherein a consumer can get a free credit report each year from the three major credit reporting agencies; this offer is woefully inadequate.[8]

9.      Despite learning of the Data Breach as early as May 13, 2023, Defendant failed to announce the Data Breach publicly *more than seven months later on* or around December 28, 2023, and did not begin sending out Data Breach notification letters to affected individuals until around that time. In fact, Plaintiff did not receive the Notice until January 9, 2024 – almost eight months after Defendant became aware of the Data Breach.

10.     Defendant's Notice failed to disclose how it discovered the encrypted files on its computer systems were impacted, the means and mechanisms of the cyberattack, the reason for the delay in notifying Plaintiff and the class of the Data Breach, how Defendant determined that the Personal Information had been "accessed" by an unauthorized party, and importantly, what specific steps Defendant took following the Data Breach to secure its systems and prevent future cyberattacks.

11.     The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect Personal Information from the foreseeable threat of a cyberattack.

12.     By being entrusted with Plaintiff's and class members' PII and PHI for its own pecuniary benefit, Defendant assumed a duty to Plaintiff and class members to implement and

---

[7] https://www.wecontrolpain.com/assets/docs/notices/data-security-event-notice.pdf (last accessed January 11, 2024).
[8] *Id.*

maintain reasonable and adequate security measures to secure, protect, and safeguard Plaintiff's and class members' PII and PHI against unauthorized access and disclosure.

13.    Defendant also had a duty to adequately safeguard this PII and PHI under controlling Florida case law, as well as pursuant to industry standards and duties imposed by statutes, including Section 5 of the Federal Trade Commission Act (the "FTC Act").

14.    Defendant breached those duties by, among other things, failing to implement and maintain reasonable security procedures and practices to protect the PII and PHI in its possession from unauthorized access and disclosure.

15.    As a result of Defendant's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiff and approximately 543,000 class members suffered injury and ascertainable losses in the form of out-of-pocket expenses, loss of value of their time reasonably incurred to remedy or mitigate the effects of the attack, the diminution in value of their personal information from their exposure, and the present and continuing threat of fraud and identity theft. This action seeks to remedy these failings and their consequences.

16.    The injury to Plaintiff and class members was compounded by the fact that Defendant did not notify those affected that their PII and PHI were subject to unauthorized access and exfiltration until late December 2023, more than seven months after the Data Breach was discovered.

17.    Defendant's failure to timely notify the victims of its Data Breach meant that Plaintiff and class members were unable to immediately take affirmative measures to prevent or mitigate the resulting harm.

18.    Despite having been accessed and exfiltrated by unauthorized criminal actors, Plaintiff's and class members' sensitive and confidential PII and PHI remains in the possession of

Defendant. Absent additional safeguards and independent review and oversight, the information remains vulnerable to further cyberattacks and theft.

19.    Defendant disregarded the rights of Plaintiff and class members by, *inter alia*, failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard PII and PHI; failing to take standard and reasonably available steps to prevent the Data Breach; failing to properly train its staff and employees on proper security measures; and failing to provide Plaintiff and class members prompt and adequate notice of the Data Breach.

20.    In addition, Defendant failed to properly monitor the computer network and systems that housed the PII and PHI. Had Defendant properly monitored these electronic systems, it would have discovered the intrusion sooner or prevented it altogether.

21.    The security of Plaintiff's and class members' identities is now at risk because of Defendant's wrongful conduct as the PII and PHI that Defendant collected and maintained are now in the hands of data thieves. This present risk will continue for the course of their lives.

22.    Armed with the PII and PHI accessed in the Data Breach, data thieves can commit a wide range of crimes including, for example, opening new financial accounts in class members' names, taking out loans in their names, using class members' identities to obtain government benefits, filing fraudulent tax returns using their information, obtaining driver's licenses in class members' names, and giving false information to police during an arrest.

23.    As a result of the Data Breach, Plaintiff and class members have been exposed to a present and imminent risk of fraud and identity theft. Among other measures, Plaintiff and class members must now and in the future closely monitor their financial accounts to guard against

identity theft. Further, Plaintiff and class members will incur out-of-pocket costs to purchase adequate credit monitoring and identity theft protection and insurance services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

24.     Plaintiff and class members will also be forced to expend additional time to review credit reports and monitor their financial accounts for fraud or identity theft. And because the exposed information includes Social Security numbers, sensitive medical information, and other immutable personal details, the risk of identity theft and fraud will persist throughout their lives.

25.     Plaintiff brings this action on behalf of herself and individuals in the United States whose Personal Information was exposed because of the Data Breach, Defendant learned of on or about May 13, 2023, and first publicly acknowledged on or about December 28, 2023. Plaintiff and class members seek to hold Defendant responsible for the harms resulting from the massive and preventable disclosure of such sensitive and personal information. Plaintiff seeks to remedy the harms resulting from the Data Breach on behalf of herself and all similarly situated individuals whose Personal Information was accessed and exfiltrated during the Data Breach.

26.     Plaintiff, on behalf of herself and all other class members, brings claims for negligence, negligence per se, breach of implied contract, breach of fiduciary duty, and for declaratory and injunctive relief. To remedy these violations of law, Plaintiff and class members thus seek actual damages, statutory damages, restitution, and injunctive and declaratory relief (including significant improvements to Defendant's data security protocols and employee training practices), reasonable attorneys' fees, costs, and expenses incurred in bringing this action, and all other remedies this Court deems just and proper.

## PARTIES

### *Plaintiff Tamara St. Mary*

27.     Plaintiff Tamara St. Mary ("Plaintiff") is a citizen of Florida. At all relevant times, Plaintiff has resided in Sarasota, Florida.

28.     As a customer, Plaintiff provided her PII and PHI to Defendant. In receiving and maintain her PII and PHI for its business purposes, Defendant expressly and impliedly promised, and undertook a duty, to act reasonably in its handling of Plaintiff's PII and PHI. Defendant, however, did not take proper care of Plaintiff's PII and PHI, leading to its exposure to and exfiltration by cybercriminals as a direct result of Defendant's inadequate security measures.

29.     On January 9, 2024, Plaintiff received notice of the Data Breach. Concerned, Plaintiff immediately emailed Defendant, but received an automated message stating Defendant would respond in 7 to 10 days. Plaintiff then went onto the internet to research the breach because she was and currently is under pain management care, purchasing TENS products from Defendant.

30.     Furthermore, Plaintiff logged into Credit Karma to ensure that there was no nefarious activity. Although there has been no record of any nefarious activity, Plaintiff has noticed a significant increase in spam emails and texts since April/May 2023, the period the Data Breach occurred. Finally, out of an abundance of caution, Plaintiff changed her account passcodes and further plans to remediate the breach with her own daily self-monitoring.

31.     Plaintiff has suffered harm because of the Data Breach. Since learning of the Data Breach, Plaintiff has spent a significant amount of time researching the potential consequences of the Data Breach and checking her credit and financial accounts for unauthorized activity, which are practices Plaintiff will need to continue to indefinitely conduct to protect herself against fraud and identity theft.

32.     Plaintiff also suffered actual injury from having her PII and PHI compromised because of the Data Breach, including, but not limited to: (a) damage to and diminution in the value of her confidential personal information—a form of property that Plaintiff entrusted to Defendant, which was compromised because of the Data Breach it failed to prevent and (b) a violation of her privacy rights because of Defendant's unauthorized disclosure of her PII and PHI.

33.     Had Plaintiff known that Defendant do not adequately protect PII and PHI, she would not have agreed to provide Defendant with her PII and PHI or agreed to have her PII and PHI provided to Defendant.

34.     As a result of Defendant's failure to adequately safeguard Plaintiff's information, she has been injured. Plaintiff is also at a present and continuing  risk of harm because her information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate data security measures to protect the PII and PHI in its possession.

### *Defendant Electrostim Medical Services, Inc.*

35.     Defendant Electrostim Medical Services, Inc. is corporation organized under the laws of the State of Florida. Defendant maintains its principal place of business at 3504 Cragmont Drive Suite #100 Tampa, Florida, 33619.

36.     Electrostim Medical Services, Inc. is a privately held company located in Tampa, Florida, and it is "a medical device company specializing in home electrical stimulation devices, bracing, and accessors for pain management and physical rehabilitation."[9]

---

[9] https://www.wecontrolpain.com/about (last accessed January 11, 2024).

37.    Electrostim Medical Services, Inc. is "an affiliate of Validus Group, a private investment firm which is also based in Tampa, Florida."[10]

## JURISDICTION AND VENUE

38.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from Defendant. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

39.    This Court has general personal jurisdiction over Defendant because Defendant's principal place of business is in this District. Mario Garcia, Jr., who is identified as the Chairman and Founder of Electrosim Medical Services, "continues to maintain his residence and operate his businesses in Hillsborough County."[11]

40.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District and Defendant has harmed Class Members residing in this District.

## FACTUAL ALLEGATIONS

### A. Overview of Defendant's Business

41.    Electrosim Medical Services, Inc. describes itself as "the leading designer, manufacturer, and provider of non-invasive medical devices used to control pain, and muscle

---

[10] https://www.thelyonfirm.com/blog/electrostim-medical-services-emsi-data-breach/ (last accessed January 11, 2024).
[11] https://www.wecontrolpain.com/about (last accessed January 11, 2024).

rehabilitation. Founded in 1995, [Electrostim Medical Services, Inc.] maintained a single goal to facilitate relief for patients with pain, and muscle related issues."[12]

42.     According to Defendant, "[Electrostim Medical Services, Inc.] has been providing assistance to hundreds of thousands of people throughout the United States and improving overall quality of life."[13]

43.     In the regular course of its business, Defendant collects and maintains the PII and PHI of its customers and other persons as a condition to providing its medical services. Defendant stores this information digitally. Defendant specifies in its Privacy Policy that it uses collected PII and PHI to provide its customers with medical treatment or services, billing and payment services, and other health care purposes.[14]

44.     Defendant's Privacy Policy ensures its customers and other related persons that it "understand[s] that medical information about you and your health is personal. Protecting medical information about you is important."[15]

45.     By obtaining, collecting, using, and benefitting from Plaintiff's and class member's PII, Defendant assumed legal and equitable duties to them that required Defendant to, at a minimum, implement adequate safeguards to prevent unauthorized use or disclosure of PII and PHI and to report any unauthorized use or disclosure sensitive Personal Information.

46.     Plaintiff and Class members are, or were, customers of Defendant, or otherwise, are affiliated or transacted with Defendant and entrusted Defendant with their PII and PHI.

47.     Plaintiff and Class Members reasonably relied on Defendant to maintain the confidentiality and security of their PII and PHI and only to make required, authorized disclosures

---

[12] https://www.linkedin.com/company/emsi_2 (last accessed January 11, 2024).
[13] *Id.*
[14] https://www.wecontrolpain.com/privacy-policy (last accessed January 11, 2024).
[15] *Id.*

of this information, which Defendant ultimately failed to do. Compounding Defendant's breach of these duties, Defendant waited more than seven months after discovering the Data Breach to notify those affected that their PII and PHI had been compromised.

**B. The Data Breach Compromised Plaintiff's and Class Members' PII and PHI**

48.     On or about May 13, 2023, according to Defendant's Notice, Defendant detected unusual activity on its systems. The Notice stated that an investigation "determined that an unknown actor gained access to certain parts of our network between April 27, 2023, and May 13, 2023. Following this determination, [Electrostim Medical Services, Inc.] began an in-depth process to identify the information that may have been contained in the impacted environment, identify the individuals whose information may have been impacted, and reviewed internal [Electrostim Medical Services, Inc.] records to identify address information for potentially impacted individuals."[16]

49.     Defendant did not publicly announce the Data Breach until on or around November December 28, 2023.[17] Defendant admitted that the unauthorized party accessed files within its system that included sensitive PII and PHI, including "an individual's name, address, email address, phone number(s), diagnosis, insurance information and subscriber number, product(s) prescribed and billed."[18]

50.     Defendant's s Notice vaguely describes the measures it took following its discovery of the Data Breach, stating only that it "immediately commenced an investigation to confirm the

---

[16] https://www.wecontrolpain.com/assets/docs/notices/data-security-event-notice.pdf (last accessed January 11, 2024).
[17] https://www.jdsupra.com/legalnews/electrostim-medical-services-notifies-2215745/ (last accessed January 11, 2024).
[18] https://www.wecontrolpain.com/assets/docs/notices/data-security-event-notice.pdf (last accessed January 11, 2024).

nature and scope of the incident."[19] Additionally, it "reported the event to law enforcement" and "are taking steps to implement additional safeguards related to data privacy and security."[20]

51.     Defendant's Notice omits pertinent information including how criminals gained access to the encrypted files on its systems, what computer systems were impacted, the means and  mechanisms of the cyberattack, the reason for the delay in notifying Plaintiff and class members  of the Data Breach, how it determined that the PII and PHI had been accessed, and of particular importance  to Plaintiff and class members, what actual steps Defendant took following the Data Breach to secure its systems and train its employees to prevent further cyberattacks.

52.     Based on Defendant's acknowledgment that "an unauthorized actor gained access to certain systems" and determined that certain "information was present at the time of the incident," it is evident that unauthorized criminal actors did in fact access Defendant's network and exfiltrate Plaintiff's and class members' PII and PHI in an attack designed to acquire that sensitive, confidential, and valuable information.[21]

53.     The PII and PHI contained in the files accessed by cybercriminals appears not to have been encrypted because if properly encrypted, the attackers would have acquired unintelligible data and would not have "accessed" Plaintiff's and class members' sensitive Personal Information.[22]

54.     Defendant did not confirm whether some or all its locations, or other associated corporate entities, were impacted by the Data Breach.[23] Overall, the Data Breach reportedly impacted the approximately 543,000 individuals like Plaintiff and class members.[24]

---

[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] https://www.idstrong.com/sentinel/healthcare-cyber-attack-half-a-million-records-stollen/ (last accessed January 11, 2024).

55.     As a corporate entity that collects and maintains significant volumes of sensitive Personal Information, the targeted attack was a foreseeable risk of which Defendant was aware and knew it had a duty to guard against.

56.     The targeted attack was expressly designed to gain access to and exfiltrate private and confidential data, including (among other things) the PII and PHI of Defendant's customers and other individuals who are affiliated or transacted with Defendant.

57.     Despite detecting the Data Breach on or around May 13, 2023, Defendant waited more than seven months to notify the impacted individuals of the Data Breach and of the need for them to protect themselves against fraud and identity theft. Defendant was, of course, too late in the discovery and notification of the Data Breach in contravention of its legal duty to protect such information.

58.     Due to Defendant's inadequate security measures and its delayed notice to victims, Plaintiff and class members now face a present, immediate, and ongoing risk of fraud and identity theft and must deal with that threat forever.

59.     Defendant had obligations created by contract, industry standards, Section 5 of FTC Act, and common law made to Plaintiff and class members to keep their PII and PHI confidential and to protect its customers' Personal Information from unauthorized access and disclosure.

60.     Plaintiff and class members entrusted their PII and PHI to Defendant with the reasonable expectation and mutual understanding that Defendant or anyone who used their PII and PHI in conjunction with workface analytics or HR services would comply with obligations to keep such information confidential and secure from unauthorized access after it received such information.

61.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and class members' PII and PHI, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and class members' PII and PHI from unauthorized disclosure.

62.     Plaintiff and the class members have taken reasonable steps to maintain the confidentiality of their personal information. Plaintiff and class members would not have allowed Defendant or anyone in Defendant's position to receive their PII and PHI had they known that Defendant would fail to implement industry standard protections for that sensitive information.

63.     As a result of Defendant's negligent and wrongful conduct, Plaintiff's and class members' highly confidential and sensitive Personal Information was left exposed to cybercriminals.

**C.  Defendant Failed to Follow FTC Guidelines**

64.     Defendant were also prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

65.     The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices.

66.     According to the FTC, the need for data security should be factored into all business decision-making.

67.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses.

68.     The guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

69.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

70.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

71.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

72.     Defendant failed to properly implement basic data security practices.

73.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to individuals' PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

74.     Defendant was at all times fully aware of their obligation to protect the Personal Information of the employees and customers of their clients who entrusted Defendant with their PII and PHI. Defendant was also aware of the significant repercussions that would result from their failure to do so.

**D.  Defendant Failed to Comply with Industry Standards for Data Security**

75.     Experts studying cyber security routinely identify corporations as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

76.     Several best practices have been identified that at a minimum should be implemented by corporate entities like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

77.     Other standard best cybersecurity practices include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

78.      Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5,

PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

79.     These foregoing frameworks are existing and applicable industry standards in the corporate industry and Defendant failed to comply with these accepted standards, thereby opening the door to cybercriminals and causing the Data Breach.

**E.  Defendant Owed Plaintiff and Class Members a Duty to Safeguard Their Personal Information**

80.     In addition to their obligations under federal and state laws, Defendant owed a duty to Plaintiff and class members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII and PHI in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Plaintiff and class members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the PII and PHI of class members.

81.     Defendant owed a duty to Plaintiff and Class members to create and implement reasonable data security practices and procedures to protect the PII and PHI in its possession, including adequately training its employees and others who accessed PII and PHI within its computer systems on how to adequately protect PII and PHI.

82.     Defendant owed a duty to Plaintiff and Class members to implement processes that would detect a compromise of PII and PHI in a timely manner.

83.     Defendant owed a duty to Plaintiff and Class members to act upon data security warnings and alerts in a timely fashion.

84.    Defendant owed a duty to Plaintiff and Class members to disclose in a timely and accurate manner when and how the Data Breach occurred.

85.    Defendant owed a duty of care to Plaintiff and Class members because they were foreseeable and probable victims of any inadequate data security practices.

**F.  Defendant Knew That Criminals Target PII and PHI**

86.    Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in industries holding significant amounts of PII and PHI preceding the date of the breach.

87.    At all relevant times, Defendant knew, or should have known, that Plaintiff's, and all other Class members' PII and PHI were targets for malicious actors. Despite such knowledge, Defendant failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and class members' PII and PHI from cyber-attacks that Defendant should have anticipated and guarded against.

88.    The targeted attack was expressly designed to gain access to and exfiltrate private and confidential data, including (among other things) the PII and PHI customers of Defendant's clients, like Plaintiff and class members.

89.    Personal Information is a valuable property right.[25] The value of Personal Information as a commodity is measurable.[26] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[27] American companies are estimated to have spent

---

[25] See Marc van Lieshout, The Value of Personal Data, 457 IFIP Advances in Information and Communication Technology (May 2015), https://www.researchgate.net/publication/283668023 ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible..."). (last accessed December 8, 2023).
[26] See Robert Lowes, Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market, Medscape (Apr. 28, 2014), http://www.medscape.com/viewarticle/824192 .(last accessed December 8, 2023).
[27] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring

over $19 billion on acquiring personal data of consumers in 2018.[28] It is so valuable to identity thieves that once Personal Information has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web" for many years.

90.     As a result of its real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, Social Security numbers, Personal Information, and other sensitive information directly on various Internet websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

91.     Personal Information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[29] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[30] All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[31] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[32] According to a report released by the Federal

---

Monetary Value, OECD Digital Economy Papers, No. 220, p.4, OECD Publishing (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en (last accessed December 8, 2023)
[28] U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017, Interactive Advertising Bureau (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/ (last accessed December 8, 2023).
[29] Anita George, Your personal data is for sale on the dark web. Here's how much it costs, Digital Trends (Oct. 16, 2019), accessible at https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs// (last accessed December 8, 2023).
[30] Brian Stack, Here's How Much Your Personal Information Is Selling for on the Dark Web, Experian (Dec. 6, 2017), accessible at https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed December 8, 2023).
[31] Adam Greenberg, Health insurance credentials fetch high prices in the online black market, SC Magazine (July 16, 2013), accessible at https://www.scmagazine.com/news/health-insurance-credentials-fetch-high-prices-in-the-online-black-market (last accessed December 8, 2023).
[32] In the Dark, VPNOverview.com, accessible at https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

Bureau of Investigation's (FBI) Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[33]

92.    Criminals can use stolen Personal Information to extort a financial payment by "leveraging details specific to a disease or terminal illness."[34] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . .. By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[35]

93.    Consumers place a high value on the privacy of that data. Researchers shed light on how many consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[36]

94.    Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII and/or PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

95.    Indeed, cyberattacks have been common for over ten years with the Federal Bureau of Investigation ("FBI") warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals

---

(last accessed December 8, 2023).

[33] See Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain, FBI Cyber Division (Apr. 8, 2014), accessible at  https://info.publicintelligence.net/FBI-HealthCareCyberIntrusions.pdf (last accessed December 8, 2023).

[34] Andrew Steger, What Happens to Stolen Healthcare Data? HealthTech (Oct. 30, 2019),  accessible at https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last accessed December 8, 2023).

[35] Id.

[36] Janice Y. Tsai et al., The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study, 22(2) Information Systems Research 254 (June 2011), accessible at  https://www.jstor.org/stable/23015560?seq=1 (last accessed December 8, 2023).

will use their accesses to obtain PII." The FBI further warned that that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[37]

96.      Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals… because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[38]

97.      Defendant was on notice that the federal government has been concerned about company data encryption practices. Defendant knew it employees accessed and utilized protected consumer information in the regular course of their duties, yet it appears that information was not encrypted.

98.      The Office for Civil Rights ("OCR") urges the use of encryption of data containing sensitive personal information. As long ago as 2014, the Department fined two healthcare companies approximately two million dollars for failing to encrypt laptops containing sensitive personal information. In announcing the fines, Susan McAndrew, OCR's deputy director of health information privacy, stated "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[39]

### G.  Theft of PII and PHI Has Grave and Lasting Consequences for Victims

---

[37] Gordon M. Snow, Statement before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit, FBI (Sept. 14, 2011), accessible at  https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector (last accessed December 8, 2023).
[38] Ben Kochman, FBI, Secret Service Warn of Targeted Ransomware, Law360 (Nov. 18, 2019), accessible at https://www.law360.com/articles/1220974 (last accessed December 8, 2023).
[39] Stolen Laptops Lead to Important HIPAA Settlements, U.S. Department of Health and Human Services (Apr. 22, 2014), accessible at  https://www.hhs.gov/hipaa/for-professionals/compliance-enforcement/examples/concentra-health-services/index.html (last accessed December 8, 2023).

99.     Theft of PII and PHI is serious. The FTC warns consumers that identity thieves use PII and PHI to exhaust financial accounts, received medical treatment, start new utility accounts, and incur charges and credit in a person's name.[40]

100.    Identity thieves use PII and PHI for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[41] According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card number to withdraw funds, obtain a new driver's license or ID, and/or use the victim's information in the event of arrest or court action.[42]

101.    With access to an individual's PII, criminals can do more than just empty a victim's bank account – they can also commit all manner of fraud, including: obtaining a driver's license or official identification card in the victim's name but with the thief's picture, using the victim's name and SSN to obtain government benefits, or filing a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's SSN, rent a house, or

---

[40] See What to Know About Identity Theft, Federal Trade Commission Consumer Advice, accessible at https://www.consumer.ftc.gov/articles/what-know-about-identity-theft(last accessed on December 8, 2023).

[41] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[42] Susan Henson, What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself?, Experian (May 21, 2023), accessible at https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/ (last accessed on December 8, 2023).

receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[43]

102.    Each year, identity theft causes billions of dollars of losses to victims in the United States. For example, with the PII and PHI stolen in the Data Breach, which includes Social Security numbers, identity thieves can open financial accounts, commit medical fraud, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft. These criminal activities have and will result in devastating financial and personal losses to Plaintiff and class members.

103.    Personal Information is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it and trade the information on dark web black-markets for years.

104.    For example, it is believed that certain highly sensitive personal information compromised in the 2017 Experian data breach was being used, three years later, by identity thieves to apply for COVID-19-related unemployment benefits.

105.    The PII and PHI exposed in this Data Breach is valuable to identity thieves for use in the kinds of criminal activity described herein. These risks are both certainly present, continuing and substantial. As the FTC has reported, if cyber thieves get access to a person's highly sensitive information, they will use it.[44]

---

[43] See Warning Signs of Identity Theft, Federal Trade Commission, accessible at https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last accessed on December 8, 2023).
[44] Ari Lazarus, How fast will identity thieves use stolen info?, Federal Trade Commission (May 24, 2017), accessible at https://www.linkedin.com/pulse/how-fast-identity-thieves-use-stolen-info-brian-allen/ (last accessed on December 8, 2023).

106.     Cyber criminals may not use the information right away. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

107.     [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[45]

108.     For instance, with a stolen Social Security number, which is only one subset of the Personal Information compromised in the Data Breach, someone can open financial accounts, get medical care, file fraudulent tax returns, commit crimes, and steal benefits.[46]

109.     Identity thieves can use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

110.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."

---

[45] Report to Congressional Requesters: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, United States Government Accountability Office, accessible at https://www.gao.gov/assets/gao-07-737.pdf (last accessed on December 8, 2023).

[46] See, e.g., Christine DiGangi, 5 Ways an Identity Thief Can Use Your Social Security Number (Nov. 2, 2017), accessible at https://www.usatoday.com/story/money/personalfinance/2017/11/15/5-ways-identity-thief-can-use-your-social-security-number/860643001/ (last accessed on December 8, 2023).

111.      Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[47]

112.      Theft of Social Security numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. To obtain a new number, a breach victim must demonstrate ongoing harm from misuse of her SSN, and a new SSN will not be provided until after the victim has suffered the harm.

113.      Due to the highly sensitive nature of Social Security numbers, theft of Social Security numbers in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you haven't gotten a credit freeze yet, you're easy pickings."[48]

114.       There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that her or his Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

---

[47] 2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, their Families, Friends, and Workplaces, Identity Theft Resource Center (2021), accessible at  https://www.idtheftcenter.org/wp-content/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf (last accessed on December 8, 2023).
[48] Patrick Lucas Austin, 'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say, TIME (Aug. 5, 2019), accessible at  https://time.com/5643643/capital-one-equifax-data-breach-social-security/ (last accessed on December 8, 2023).

115.    For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[49]

116.    It is within this context that Plaintiff and all other class members must now live with the knowledge that their Personal Information is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

117.    A study by the Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:



---

[49] John W. Coffey, Difficulties in Determining Data Breach Impacts, 17 Journal of Systemics, Cybernetics and Informatics 9 (2019), accessible at http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf (last accessed on December 8, 2023).

118.     Victims of the Data Breach, like Plaintiff and class members, must spend many hours and large amounts of money protecting themselves from the current and future negative impacts of their privacy and credit because of the Data Breach.[50]

119.     As a direct and proximate result of the Data Breach, Plaintiff and class members have been placed at a present and continuing increased risk of harm from fraud and identity theft. Plaintiff and class members must now take the time and effort (and spend the money) to mitigate the actual and potential impact of the Data Breach on their everyday lives, including purchasing identity theft and credit monitoring services every year for the rest of their lives, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions and healthcare providers, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts, credit reports, and other account information for unauthorized activity for years to come.

120.     Plaintiff and class members have suffered or will suffer actual harms for which they are entitled to compensation, including but not limited to the following:

a.  Trespass, damage to, and theft of their personal property, including Personal Information;

b.  Improper disclosure of their Personal Information;

c.  The imminent and certainly impending injury flowing from actual and potential future fraud and identity theft posed by their Personal Information being in the hands of criminals and having already been misused;

d.  The present and continuing risk of having their confidential medical information used against them by spam callers to defraud them;

---

[50] Guide for Assisting Identity Theft Victims, Federal Trade Commission, 4 (Sept. 2013), accessible at http://www.global-screeningsolutions.com/Guide-for-Assisting-ID-Theft-Victims.pdf (last accessed on December 8, 2023)..

    e.   Damages flowing from Defendant's untimely and inadequate notification of the Data Breach;

    f.   Loss of privacy suffered as a result of the Data Breach;

    g.   Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the data breach;

    h.   Ascertainable losses in the form of deprivation of the value of patients' personal information for which there is a well-established and quantifiable national and international market;

    i.   The loss of use of and access to their credit, accounts, and/or funds;

    j.   Damage to their credit due to fraudulent use of their Personal Information; and

    k.   Increased cost of borrowing, insurance, deposits, and other items which are adversely affected by a reduced credit score.

121.    Moreover, Plaintiff and class members have an interest in ensuring that their PII and PHI, which remain in the possession of Defendant, are protected from further public disclosure by the implementation of better employee training and industry standard and statutorily compliant security measures and safeguards. Defendant has shown itself t to be wholly incapable of protecting Plaintiff's and class members' PII and PHI.

**H.  The Data Breach Was Foreseeable and Preventable**

122.    Data disclosures and data breaches are preventable.[51] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of

---

[51] Lucy L. Thompson, Despite the Alarming Trends, Data Breaches Are Preventable, Data Breach and Encryption Handbook (Lucy Thompson, ed., 2012).

appropriate security solutions."[52] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[53]

> "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures … Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs."[54]

123.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[55]

124.     Plaintiff and class members entrusted their PII and PHI to Defendant as a condition of receiving consumer goods and services. Plaintiff and class members understood and expected that Defendant, or anyone in Defendant's position, would safeguard their Personal Information against cyberattacks, delete or destroy PII and PHI that Defendant was no longer required to maintain, and timely and accurately notify them if their PII and PHI were compromised.

## I.  Plaintiff's and Class Members' Damages

125.     To date, Defendant has done nothing to provide Plaintiff and class members with relief for the damages they have suffered because of the Data Breach. Defendant did not offer credit monitoring rather than that offered by law, wherein a consumer can get a free credit report each year from the three credit reporting agencies. Not only did Defendant fail to provide adequate ongoing credit monitoring or identity protection services for individuals impacted by the Data Breach, but the credit monitoring identity theft protection services does nothing to compensate class members for damages incurred and time spent dealing with the Data Breach.

---

[52] Id. At 17.
[53] Id. at 28.
[54] Id.
[55] See How to Protect Your Networks from RANSOMWARE, at 3, FBI.gov, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last accessed December 8, 2022).

126.    In fact, Plaintiff has spent time to conduct her own credit monitoring because she is consistently in receipt of spam that appears legitimate but in fact is not.

127.    On January 9, 2024, after receiving notice of the Data Breach, Plaintiff immediately emailed Defendant, but received an automated message stating Defendant would respond in 7 to 10 days. Plaintiff then went onto the internet to research the breach because she was and currently is under pain management care, causing her to purchase TENS devices from Defendant. For example, Plaintiff logged into Credit Karma to ensure that there was no nefarious activity. Although there is no record of nefarious activity resulting from the Data Breach, Plaintiff has noticed a significant increase in spam emails and texts since April/May 2023, the period the Data Breach occurred.

128.    Ultimately, Plaintiff's self-efforts and Defendant's measly offer of credit-monitoring services limited to those only offered by law are not able to contain the fallout resulting from the Data Breach. To date, Plaintiff continues to receive numerous spam notifications.

129.    Plaintiff and class members have been damaged by the compromise of their PII in the Data Breach.

130.    As a direct and proximate result of Defendant's conduct, Plaintiff and class members have been placed at a present and  continuing increased risk of harm from fraud and identity theft. Plaintiff and class members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

131.    Plaintiff and class members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their PII as potential fraudsters could use that information to target such schemes more effectively to Plaintiff and class members.

132.     Plaintiff and class members have and will also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

133.     Plaintiff and class members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

    a.  Reviewing and monitoring financial and other sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

    b.  Purchasing credit monitoring and identity theft prevention;

    c.  Placing "freezes" and "alerts" with reporting agencies;

    d.  Spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;

    e.  Contacting financial institutions and closing or modifying financial accounts; and

    f.  Closely reviewing and monitoring Social Security Number, medical insurance accounts, bank accounts, and credit reports for unauthorized activity for years to come.

134.     Plaintiff and class members suffered actual injury from having their PII compromised because of the Data Breach including, but not limited to: (a) damage to and diminution in the value of their PII and PHI, forms of property that Defendant obtained from Plaintiff and class members; (b) violation of their privacy rights; (c) imminent and impending injury arising from the increased risk of identity theft and fraud; and (d) emotional distress.

135.    Further, because of Defendant's conduct, Plaintiff and class members are forced to live with the anxiety that their PII may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy with respect to that information.

136.    As a direct and proximate result of Defendant's actions and inactions, Plaintiff and class members have suffered a loss of privacy and are at a present and continuing risk of harm.

    a.    Moreover, Plaintiff and class members have an interest in ensuring that their PII and PHI, which is believed to remain in the possession of Defendant, are protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing PII and PHI is not accessible online, is properly encrypted, and that access to such data is password protected.

137.    Many failures laid the groundwork for the occurrence of the Data Breach, starting with Defendant's failure to incur the costs necessary to implement adequate and reasonable cyber security training, procedures and protocols that were necessary to protect Plaintiff's and class members' PII and PHI.

138.    Defendant maintained the PII and PHI in an objectively reckless manner, making the sensitive Personal Information vulnerable to unauthorized disclosure.

139.    Defendant knew, or reasonably should have known, of the importance of safeguarding PII and PHI and of the foreseeable consequences that would result if Plaintiff's and class members' Personal Information was stolen, including the significant costs that would be placed on Plaintiff and class members because of the breach.

140.    The risk of improper disclosure of Plaintiff's and class members' PII was a known risk to Defendant, and thus Defendant was on notice that failing to take necessary steps to secure

Plaintiff's and class members' PII and PHI from that risk left the Personal Information in a dangerous condition.

141.    Defendant disregarded the rights of Plaintiff and class members by, inter alia, (i) intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that the PII and PHI were protected against unauthorized intrusions; (ii) failing to disclose that it did not have adequately robust security protocols and training practices in place to adequately safeguard Plaintiff's and class members' PII and PHI; (iii) failing to take standard and reasonably available steps to prevent the Data Breach; (iv) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (v) failing to provide Plaintiff and class members prompt and accurate notice of the Data Breach.

## CLASS ALLEGATIONS

142.    Plaintiff brings this class action on behalf of herself and all members of the following Classes of similarly situated persons pursuant to Federal Rule of Civil Procedure 23. Plaintiff seeks certification of a Class defined as follows:

### Nationwide Class

All persons residing in the United States whose Personal Information was compromised in the Data Breach disclosed by Defendant on or about December 28, 2023, including all who were sent notice of the Data Breach.

143.    Excluded from the class are Defendant and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge(s).

144.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

145.    **Numerosity:** The members in the class are so numerous that joinder of all class members in a single proceeding would be impracticable. As noted above, Defendant reported that approximately 543,000 individuals' information was exposed in the Data Breach.

146.    **Commonality and Predominance:** Common questions of law and fact exist as to all class members and predominate over any potential questions affecting only individual class members. Such common questions of law or fact include, inter alia:

  a.    Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and class members' PII and PHI from unauthorized access and disclosure;

  b.    Whether Defendant's computer systems and data security practices used to protect Plaintiff's and class members' Personal Information violated the FTC Act and/or state laws and/or Defendant's other duties discussed herein;

  c.    Whether Defendant failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiff and class members;

  d.    Whether Plaintiff and class members suffered injury as a proximate result of Defendant's negligent actions or failures to act;

  e.    Whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiff's and class members' PII and PHI;

  f.    Whether an implied contract existed between class members and Defendant providing that Defendant would implement and maintain reasonable security

measures to protect and secure class members' PII and PHI from unauthorized access and disclosure;

g.   Whether injunctive relief is appropriate and, if so, what injunctive relief is necessary to redress the imminent and currently ongoing harm faced by Plaintiff and class members;

h.   Whether Defendant's actions and inactions alleged herein constitute gross negligence;

i.   Whether Defendant breached its duties to protect Plaintiff's and class members' PII and PHI; and

j.   Whether Plaintiff and all other members of the class are entitled to damages and the measure of such damages and relief.

147.   Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff on behalf of herself and all other class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

148.   **Typicality:** Plaintiff's claims are typical of the claims of the class. Plaintiff, like all proposed members of the class, had her PII and PHI compromised in the Data Breach. Plaintiff and class members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all class members.

149.   **Adequacy:** Plaintiff will fairly and adequately protect the interests of the class members. Plaintiff is an adequate representative of the class and has no interests adverse to, or conflict with, the class she seeks to represent. Plaintiff has retained counsel with substantial

experience and success in the prosecution of complex consumer protection class actions of this nature.

150.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and all other class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for class members to individually seek redress from Defendant's wrongful conduct. Even if class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT I
### Negligence
*(On behalf of Plaintiff and the Class)*

151.     Defendant owed a duty to Plaintiff and all other class members to exercise reasonable care in safeguarding and protecting their PII and PHI in its possession, custody, or control.

152.     Defendant knew, or should have known, the risks of collecting and storing Plaintiff's and all other class members' PII and PHI and the importance of maintaining secure systems.  Defendant knew, or should have known, of the many data breaches that targeted corporate entities in recent years.

153.    Given the nature of Defendant's businesses, the sensitivity and value of the PII and PHI it maintains, and the resources at each of its disposal, Defendant should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring.

154.    Defendant breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and class members' PII and PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII and PHI entrusted to it—including Plaintiff's and class members' PII and PHI.

155.    It was reasonably foreseeable to Defendant that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and class members' PII and PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and class members' PII and PHI to unauthorized individuals.

156.    But for Defendant's negligent conduct or breach of the above-described duties owed to Plaintiff and class members, their PII and PHI would not have been compromised.

157.    As a result of Defendant's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and all other class members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, inter alia: (i) a present and continuing risk of identity theft and fraud—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII and PHI; (iii) breach of the confidentiality

of their PII and PHI;  (iv) deprivation of the value of their PII and PHI, for which there is a well-established national and  international market; (v) lost time and money incurred to mitigate and remediate the effects of the  Data Breach, including a present and continuing  riskof medical identity theft they face and will continue to  face; and (vii) actual or attempted fraud.

## COUNT II
### Negligence Per Se
### *(On behalf of Plaintiff and the Class)*

158.     Defendant's duties arise from, inter alia, from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to employ reasonable measures to protect and secure PII and PHI.

159.     Plaintiff and class members are within the class of persons that Section 5 of the FTCA was intended to protect.

160.     The harm occurring because of the Data Breach is the type of harm that Section 5 of the FTCA intended to guard against.

161.     It was reasonably foreseeable to Defendant that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and class members' PII and PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security  processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and class members' PII and PHI to unauthorized individuals.

162.     The injury and harm that Plaintiff and the other class members suffered was the direct and proximate result of Defendant's violations of Section 5 of the FTCA. Plaintiff and class  members have suffered (and will continue to suffer) economic damages and other injury and

actual harm in the form of, inter alia: (i) a present and continuing risk of identity theft and fraud—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII and PHI; (iii) breach of the confidentiality of their PII and PHI; (iv) deprivation of the value of their PII and PHI, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including a present and continuing risk of identity theft they face and will continue to face; and (vi) actual or attempted fraud.

### COUNT III
### Breach of Fiduciary Duty
### *(On behalf of Plaintiff and the Class)*

163. Plaintiff and class members either directly or indirectly gave Defendant its PII and PHI in confidence, believing that Defendant would protect that information. Plaintiff and class members would not have provided Defendant with this information had they known they would not be adequately protected. Defendant's acceptance and storage of Plaintiff's and class members' PII and PHI created a fiduciary relationship between Defendant and Plaintiff and class members. Considering this relationship, Defendant must act primarily for the benefit of their employees and customers and other individuals who are otherwise affiliated or transacted with Defendant, which includes safeguarding and protecting Plaintiff's and class members' PII and PHI.

164. Defendant has a fiduciary duty to act for the benefit of Plaintiff and class members upon matters within the scope of their relationship. It breached that duty by failing to properly protect the integrity of the system containing Plaintiff's and class members' PII and PHI, failing to comply with the data security guidelines and best practices, and otherwise failing to safeguard the PII and PHI of Plaintiff and class members it collected.

165.     As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and class members have suffered and will suffer injury, including, but not limited to: (i) a present risk and continuing risk  of identity theft; (ii) the compromise, publication, and theft  of their  Personal  Information;  (iii)  out-of-pocket  expenses  associated  with  the prevention,  detection,  and  recovery  from  unauthorized  use  of  their  PII  and  PHI;  (iv)  lost opportunity costs associated  with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the  continued risk to their PII and PHI which remains in Defendant's possession; (vi) future costs in terms of  time, effort, and money that will be required to prevent, detect, and repair the impact of the  Personal Information compromised as a result of the Data Breach; and (vii) actual or attempted  fraud.

## **COUNT IV**
### **Breach of Implied Contract**
### *(On behalf of Plaintiff and the Class)*

166.     Defendant required Plaintiff and class members to provide, or authorize the transfer of, their PII and PHI for Defendant to provide services. In exchange, Defendant entered implied contracts with Plaintiff and class members in which Defendant agreed to comply with their statutory and common law duties to protect Plaintiff's and class members' PII and PHI and to timely notify them in the event of a data breach.

167.     Plaintiff and class members would not have provided their PII to Defendant had they known that Defendant would not safeguard their PII and PHI, as promised, or provide timely notice of a data breach.

168.     Plaintiff and class members fully performed their obligations under their implied contracts with Defendant.

169.    Defendant breached its implied contracts by failing to safeguard Plaintiff's and class members' PII and PHI and by failing to provide them with timely and accurate notice of the Data Breach.

170.    The losses and damages Plaintiff and class members sustained (as described above) were the direct and proximate result of Defendant's breach of its implied contracts with Plaintiff and the class members.

## COUNT V
### Declaratory and Injunctive Relief
*(On behalf of Plaintiff and the Class)*

171.    Defendant owes a duty of care to Plaintiff and class members that require it to adequately secure Plaintiff's and class members' PII and PHI.

172.    Defendant still possesses the PII and PHI of Plaintiff and the class members.  Defendant has not satisfied its contractual obligations and legal duties to Plaintiff and the class members.

173.    Actual harm has arisen in the wake of the Data Breach regarding Defendant's contractual obligations and duties of care to provide security measures to Plaintiff and class members. Further, Plaintiff and class members are at a present and continuing risk of harm due to the exposure of their PII and PHI and Defendant's failure to address the security failings that led to such exposure.

174.    There is no reason to believe that Defendant's employee training and security measures are any more adequate now than they were before the breach to meet Defendant's contractual obligations and legal duties.

175.    Plaintiff, therefore, seeks a declaration (1) that Defendant's existing data security measures do not comply with its contractual obligations and duties of care to provide adequate

data security, and (2) that to comply with its contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to, the following:

    a.  Ordering that Defendant engages internal security personnel to conduct testing, including audits on Defendant's systems, on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

    b.  Ordering that Defendant engages third-party security auditors and internal personnel to run automated security monitoring;

    c.  Ordering that Defendant audit, test, and train its security personnel and employees regarding any new or modified data security policies and procedures;

    d.  Ordering that Defendant purge, delete, and destroy, in a reasonably secure manner, any Personal Information not necessary for their provision of services;

    e.  Ordering that Defendant conduct regular database scanning and security checks; and

    f.  Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel and employees how to safely share and maintain highly sensitive personal information, including but not limited to, patient personally identifiable information and patient protected health information.

### PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the class, respectfully request that the Court enter judgment in her favor and against Defendant as follows:

A. Certifying the class as requested herein, designating Plaintiff as Class representative, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. Awarding Plaintiff and the class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of herself and the class, seeks appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft;

D. Awarding Plaintiff and the class pre-judgment and post-judgment interest to the maximum extent allowable;

E. Awarding Plaintiff and the class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Awarding Plaintiff and the class such other favorable relief as allowable under law.

### JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: January 11, 2024


Respectfully submitted,

John Yanchunis
FL Bar No. 324681
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin Street
6th Floor
Tampa, Florida 33602
Phone: (813) 223-5505
Email: jyanchunis@forthepeople.com

Jennifer S. Czeisler (*pro hac vice* to be filed)
**STERLINGTON, PLLC**
One World Trade Center
85th Floor
New York, New York 10007
Telephone: (212) 433-2993
jen.czeisler@sterlingtonlaw.com

Edward W. Ciolko (*pro hac vice* to be filed)
**STERLINGTON, PLLC**
One World Trade Center
85th Floor
New York, New York 10007
Telephone: (212) 433-2993
edward.ciolko@sterlingtonlaw.com

James M. Evangelista (*pro hac vice* to be filed)
**EVANGELISTA WORLEY LLC**
10 Glenlake Parkway, Suite 130
Atlanta, GA 30328
Tel: (404) 205-8400
Fax: (404) 205-8395
jim@ewlawllc.com